**Vak LA, individually and as Administrator Ad Prosequendum of the Estate of Kyung–Ho La, and Myung–Ok La, Plaintiffs,**

v.

**Raymond HAYDUCKA, Scott Williams, Kenneth Drost, Leonard Hibbitts, Pat O'Brien, Jeff Karpiscak, Richard Schwarz, South Brunswick Police Department, South Brunswick Police Chief Michael Paquette, John Does 1–20, and ABC Corporations 1–10, Defendants.**

No. CIV.00–03045 AMW.

United States District Court,
D. New Jersey.

June 24, 2003.

Adam M. Slater, Nagel, Rice, Dreifuss & Mazie, Livingston, NJ, for Plaintiff.

Lori A. Dvorak, Lynch Martin, North Brunswick, NJ, for Defendant South Brunswick Police Department.

Jack Venturi, New Brunswick, NJ, for Defendant Raymond Hayducka, Jr.

David J. MacMain, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Defendant Individual Officers.

## OPINION

WOLIN, District Judge.

This case highlights the tension that sometimes exists between police and citizens when the aggressive actions of an emotionally disturbed resident obscure the line between lawful and unlawful conduct, and result in the tragic loss of life. It is cases such as this that fragment communities and heighten the rhetoric of discrimi-

nation, particularly when the victim is a non-Caucasian.

The heated emotions that emanate from Kyung–Ho La's death have been translated into the current legal discourse between the plaintiffs and the defendants. Notwithstanding, it is the role of this Court to objectively evaluate the issues in an atmosphere of judicial calm. Towards that end, the Court will consider the motions and cross-motions presented through the moving papers of respective counsel. Counsel for defendants, Raymond Hayduka, Scott Williams, Jeffrey Karpiscak, Richard Schwarz and the South Brunswick Police Chief, Michael Paquette have moved for summary judgment on all of the claims against them. Defendant, South Brunswick Police ("SBPD"), subsequently filed its own motion for summary judgment. Plaintiffs, Vak La ("Vak") and Myung–Ok La ("Myung–Ok"), responded to defendants' motions and filed a cross-motion for partial summary judgment. The Court has decided this matter based on the written submissions pursuant to the Federal Rules of Civil Procedure 78.

For the reasons set forth below, the Court grants the application of defendants Hayduka, Williams, Karpiscak and Schwarz for summary judgment based on the claims of unreasonable search and seizure. The motion for summary judgment for Karpiscak and Schwarz based on excessive force, conspiracy and false arrest is granted. Summary judgment is granted to Williams regarding the excessive force claim. The application of defendant Pa-quette for dismissal is denied because Paquette's liability is considered in conjunction with that of the SBPD. The SBPD's application for summary judgment based on failure to train and racial animus is granted. Individual defendant officers are also granted summary judgment regarding the allegations of racial animus. The cross-motion for summary judgment filed by plaintiffs is denied for all claims. Finally, the Court reserves its ruling on whether Hayduka should be granted summary judgment for the excessive force claim pending a Daubert hearing with the intention of more thoroughly evaluating the qualifications of plaintiffs' medical expert.

## BACKGROUND

Plaintiffs have filed this suit on behalf of their deceased son, Kyung–Ho La ("Kyung–Ho") who died as a result of a bullet wound. While on duty, SBPD Officer Hayduka fired his gun once at Kyung–Ho when Kyung–Ho allegedly lunged at him with a long sword. The shooting incident was the third time that Kyung–Ho came into contact with the SBPD in an eight-month period.[1] Prior to April 24, 1999, Kyung–Ho had one minor brush with the law, but he had no prior record with the SBPD.[2]

The Court views the evidence presented and facts of this case in a light most favorable to plaintiff because the bulk of this Opinion addresses the summary judgment motions of defendants. For the portions of the Opinion where the Court

---

1. The first incident was on April 24, 1999, when Kyung–Ho scuffled with SBPD Officers Karpiscak and Schwarz. On December 17, 1999, SBPD Officers questioned Kyung–Ho outside his home regarding neighborhood vandalism. The third incident occurred on December 20, 1999, when Kyung–Ho was shot during an on-site mental health screening. These incidents and their ramifications are examined in this Opinion.

2. In December 1998, Kyung–Ho was arrested by the officers of the Leonia, New Jersey police department for a DUI offense. The record suggests that Kyung–Ho may have harbored suspicions and possibly hostility toward law enforcement officers as a result of his December 1998 arrest.

considers plaintiffs' summary judgment motion, the Court will consider the facts in a light most favorable to defendants.

Kyung–Ho was an American citizen of Korean descent. He was a thirty-year old graduate of the University of Pittsburgh who was unemployed and lived at home with his parents in Kendall Park, New Jersey. Kyung–Ho had a spotty employment history since his graduation. The record shows that he irregularly performed handyman-type jobs until December 1998, when he ceased employment altogether.

On April 24, 1999, defendant SBPD Officer Karpiscak was dispatched to investigate "someone having a mental breakdown." (Karpiscak Dep. at 8). Karpiscak arrived at the Sisco residence, which is across the street from the La residence and met with SBPD Officer Schwarz, who came to the Sisco residence moments earlier. (Karpiscak Dep. at 11). There were several neighborhood residents in the Sisco home, all of whom had signed a petition that complained about the behavior of Kyung–Ho which they described as bizarre and potentially dangerous.

Mrs. Sisco recited examples of Kyung–Ho's strange and threatening behavior to Karpiscak and Schwarz. Mrs. Sisco explained that Kyung–Ho was seen jumping off the roof of his house; he would chop wood all day and night wearing a sheet on his head; he would perform strange dances in the front yard; and he threatened the neighbors and their children.[3] (Karpiscak Dep. at 13; Schwarz Dep. at 10). Mrs. Sisco was most concerned that Kyung–Ho spent a great deal of time chopping wood in the front of his house with a "sword."[4] Mrs Sisco was also unnerved because Vak allegedly told her that he was afraid of his son and warned her to keep the neighborhood children away from Kyung–Ho.[5] After their discussion with the neighbors, Karpiscak and Schwarz decided to speak immediately to Kyung–Ho, who was in front of his house chopping wood.

As Officers Karpiscak and Schwarz approached the La's home, Kyung–Ho shouted "get off my property" and "get a search warrant."[6] (Myung–Ok Dep. at 49). Kyung–Ho was standing at the side of the house with an axe in his hand, which he dropped when the Officers told him to do so. He continued to shout, however, and walked toward Karpiscak and Schwarz as they approached the front of the La's house. As Karpiscak and Schwarz walked onto the La's front yard, Kyung–Ho stopped in front of them and took off two layers of clothing, which left him wearing an undershirt. (Myung–Ok Dep. at 49; Schwarz Dep. at 17). Myung–Ok stated that one of the officers told Kyung–Ho "don't even think of going back to get that axe." (Myung–Ok Dep. at 51). In response, Kyung–Ho said "why do I need a

---

**3.** Myung–Ok explained her son's actions by stating that Kyung–Ho jumped off the roof at one time when he was trying to fix a leak; he fashioned a head piece similar to one that he saw in a book of Korean traditional costumes; he sometimes did Tai Chi in front of their home and she denies Kyung–Ho ever made any threats. (Myung–Ok Dep. at 42, 43, 47).

**4.** The "sword" is a metal blade approximately 12"—18" long, with a broken handle that Kyung–Ho used to split wood into kindling. The Court refers to this instrument as the "wood splitter."

**5.** Vak denies having made those statements. (Vak Dep. at 49–50). Moreover, Vak denies that Kyung–Ho ever threatened the neighbors, acted irrationally or had violent outbursts. (Karpiscak Dep. at 13; Vak Dep. at 225).

**6.** Officers Karpiscak and Schwarz both testified that Kyung–Ho became irate at the sight of the approaching officers. Even before the officers had reached the side of the street of the La house, Kyung–Ho shouted a litany of obscenities and approached the officers aggressively. (Schwarz Dep. at 31).

weapon" as he took off one of his shirts. (Myung–Ok Dep. at 50–51).

Kyung–Ho was standing in front of the Officers, in close proximity when defendant Schwarz told Kyung–Ho not to take another step toward him. Against Schwarz's command, Kyung–Ho took another step toward the Officers then "stopped in a defiant move." (Schwarz Dep. at 18–19). Karpiscak immediately sprayed Kyung–Ho with pepper spray. Myung–Ok testified that Kyung–Ho was pepper sprayed as he was taking off one of his shirts and in response to the spray, he waved his arms in front of his eyes. (Myung–Ok Dep. at 52, 54).[7]

Seconds after the first blast, Karpiscak sprayed Kyung–Ho a second time. After the second blast of pepper spray, Schwarz maneuvered behind Kyung–Ho, grabbed him by the waist, lifted him, and tried to wrestle him to the ground. (Schwarz Dep. at 27). Kyung–Ho vigorously resisted the attempts of Karpiscak and Schwarz to restrain and arrest him. During the tussle, the three men fell together to the ground and rolled down the front yard. (Myung–Ok Dep. at 54). Myung–Ok did not see Kyung–Ho strike either of the Officers, nor did she see either of the Officers strike Kyung–Ho. (Myung–Ok Dep. at 55, 58).[8] Only minor injuries resulted from the altercation, Karpiscak suffered a scratched cornea and Kyung–Ho sustained some scratches and bruises. (Karpiscak Dep. at 39).

After a few minutes of struggle, Karpiscak and Schwarz secured Kyung–Ho into the back of the police cruiser. Within an hour, an ambulance arrived and transported Kyung–Ho to the Robert Wood Johnson University Hospital. (Vak Dep. at 101). Kyung–Ho stayed overnight in the hospital and the next morning he was transferred to Memorial Hospital where he underwent a psychiatric evaluation. (Vak Dep. at 102). Vak picked up Kyung–Ho from Memorial Hospital later that afternoon and was told that no further psychiatric assistance was necessary for his son. (Vak Dep. at 103). Pursuant to the events of April 24, 1999, the SBPD charged Kyung–Ho with the offenses of disorderly conduct and simple assault.

In the afternoon of December 17, 1999, three plain-clothed SBPD officers approached Kyung–Ho who was chopping wood in his front yard.[9] (Myung–Ok Dep. at 81). The officers talked with Kyung–Ho for a short period of time without incident. They questioned Kyung–Ho about the vandalism that they were investigating.[10] (Vak Dep. at 82). The officers then spoke with Kyung–Ho's parents who were also standing outside. (Myung–Ok Dep. at 83).

On December 20, 1999, the SBPD initiated an on-site psychological examination of Kyung–Ho by calling the University of Medicine and Dentistry of New Jersey ("UMDNJ") and asking for health screeners to perform an on-site mental evaluation. The SBPD decided to evaluate

---

**7.** Both Karpiscak and Schwarz, however, testified that Kyung–Ho had no visible or audible reaction to the pepper spray, except that he turned his face to Karpiscak. (Karpiscak Dep. at 25).

**8.** Karpiscak and Schwarz testified, however, that in his attempts to escape the Officers' hold, Kyung–Ho punched and bit the Officers. (Karpiscak Dep. at 30).

**9.** None of the three officers who spoke with Kyung–Ho on December 17, 1999, were involved in the April 24th incident or the December 20th incident and plaintiffs have dropped all claims against them.

**10.** The police were dispatched to the neighborhood pursuant to a call from Mr. Sisco who reported that his van window and the sliding glass door to his house had been cracked.

Kyung–Ho because Mr. and Mrs. Sisco lodged another complaint expressing concern that Kyung–Ho's bizarre and threatening behavior had increased alarmingly.

At around three that afternoon, SBPD Officer Hayduka telephoned the La residence and asked Vak if some officers could come over with an examiner from UMDNJ to evaluate Kyung–Ho's mental health. (Vak Dep. at 106). Vak did not protest their arrival, nor did he tell Hayduka that according to a previous mental health examination taken at Memorial Hospital, Kyung–Ho did not require mental health assistance. Approximately twenty minutes after the telephone call, two uniformed police officers, Hayduka and Williams arrived at the La residence along with Brian Hodgson ("Hodgson"), a mental health screener from UMDNJ.[11] Vak answered the front door, then walked into the garage with Hayduka, Williams and the screeners following him. (Vak Dep. at 110). Vak contends that nothing was said at the front door and he never invited the group into his house or asked them to follow him into the garage.[12]

Once in the garage, Vak opened the door to Kyung–Ho's room, and called him to come into the garage to talk to the people who were waiting for him. Kyung–Ho exited the door of his room and took a few steps into the garage. (Williams Dep. at 29). Kyung–Ho was visibly agitated; his eyes darted amongst the people in the garage; his expression and body language were discomposed. Hayduka and Williams stood directly in front of Kyung–Ho as he entered the garage. (Hayduka Dep. at 74). Noticing Kyung–Ho's disturbed state, the Officers tried to calm him by repeating

"we are here to help you." (Williams Dep. at 34; Hayduka Dep. at 80).

A few moments, later Kyung–Ho quickly walked backwards into the doorway of the house, crouched down to grab something, then stood up facing Hayduka and Williams. In his hand, Kyung–Ho held a long metal object—the wood splitter, and pointed it at Hayduka and Williams as he slowly backed further into the house. (Williams Dep. at 37; Hayduka Dep. at 84). Hayduka and Williams both immediately drew their weapons and shouted, "drop the knife" as they walked toward Kyung–Ho. (Hayduka Dep. at 89). Kyung–Ho continued to hold the wood splitter poised, backed further into the house and entered the den.[13] Hayduka and Williams both followed Kyung–Ho into the den with their guns unholstered, pointed at Kyung–Ho. (Williams Dep. at 40–41).

Once inside the den, Hayduka stood approximately two to three feet from Kyung–Ho and Williams stood approximately five to six feet away from Kyung–Ho. Approximately four feet to the left of the Officers was a wall and the room was full of furniture and other objects. (Williams Dep. at 45–46). With the Officers in such close proximity, shouting at Kyung–Ho to "drop the knife" Kyung–Ho crouched down and started searching for something under a sofa with his left hand. At this point, Williams moved further inside the room so he was at a different angle to Kyung–Ho as was Hayduka. (Williams Dep. at 49). Hayduka remained about two to three feet from Kyung–Ho, at the corner of the sofa under which Kyung–Ho was searching. While Kyung–Ho rummaged under the

---

11. A second healthcare worker accompanied Hodgson and the officers. During the incident, she stood near the open garage door.

12. Hodgson testified, however, that Vak conveyed that he would prefer the group to enter the house through the garage and not through the front door. (Hodgson Dep. At 41–42).

13. The den is the first room you enter from the garage and was being used as Kyung–Ho's bedroom at the time.

sofa for approximately eight to ten seconds, the wood splitter remained poised in his right hand and he looked directly at Hayduka but did not utter a sound. (Williams Dep. at 52; Hayduka Dep. at 103). Hodgson testified that Hayduka and Williams were standing a few feet inside the den when he "heard two or three or four successions of 'drop the weapon,' and then ... a single pop." (Hodgson Dep. at 66). Vak testified that he heard Hayduka and Williams shout "drop that" once or twice, then he heard a gun shot. (Vak Dep. at 120).

The time lapse between when Kyung–Ho backed into the house and when he was shot was less than two minutes. (Williams Dep. At 60; Hayduka Dep. at 114). Hayduka testified that he was standing approximately two or three feet away from Kyung–Ho when he discharged one round from his gun. (Hayduka Dep. at 116). Both Officers testified that Kyung–Ho was lunging at Hayduka with the wood splitter in hand as the single shot was fired. (Hayduka Dep. at 107–112; Williams Dep. at 52).

The bullet entered the right side of Kyung–Ho's abdomen. Plaintiffs' medical expert Dr. Walter I. Hoffman, M.D. ("Dr.Hoffman") opined that the gun barrel was behind, above and to the right of Kyung–Ho. (Plaintiff's medical expert's opinion "Hoffman Opinion" at 3). Hayduka and Williams' eyewitness testimony is controverted by Dr. Hoffman, who stated that based on the wound tract, Kyung–Ho was in a kneeling or crouching position with the front of his body away from the shooter when he was shot. (Hoffman Opinion at 3). Dr. Hoffman further opined that Kyung–Ho could not have been lunging at the time of the shooting. (Hoffman Opinion at 3).

Immediately after the blast, Kyung–Ho looked at the Officers for 2–3 seconds, then sprinted through the den and kitchen to the living room where Myung–Ok stood. Dr. Hoffman, however, opined that after sustaining such an injury, Kyung–Ho would have been dragging his leg and he would not have been able to dart into the other room. (Hoffman Opinion at 3). Hayduka and Williams then followed Kyung–Ho into the living room where they saw Myung–Ok for the first time. (Williams Dep. at 60; Myung–Ok Dep. at 97).

After he heard the gun shot, Vak exited the garage and entered the house through the front door. Vak saw Kyung–Ho in the living room kneeling between the coffee table and the couch with the wood splitter pointed to his stomach. (Vak Dep. at 126–127; Myung–Ok Dep. at 101). Hayduka and Williams ordered Vak and Myung–Ok to exit the house. (Vak Dep. at 129). The La's left the house and sat in a car with the mental health screeners for about ten minutes until an ambulance arrived. (Vak Dep. at 136).

Kyung–Ho, covered in a sheet, was carried out of the house on a stretcher and transported to Robert Wood Johnson University Hospital early that evening. Kyung–Ho underwent aggressive medical and surgical intervention, including two emergency surgeries. Nevertheless, the La's received a phone call from the hospital around three in the morning which explained that their son had lost a great deal of blood, sustained grave internal injuries and may not survive the night. (Vak Dep at 146). The La's immediately left for the hospital, but unfortunately notwithstanding the persistent efforts of the doctors, Kyung–Ho died. His death occurred approximately eight hours after admission to the hospital.

In filing this suit against the SBPD and the officers, the family of Kyung–Ho seeks relief under 42 U.S.C. § 1983.[14] Section

**14.** Section 1983 states: "Every person who, under color of any statute, ordinance, regula-

1983 does not create substantive rights, but provides a remedy for the violation of rights created by federal law. *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). A prima facie case under § 1983 requires a plaintiff to demonstrate: (1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under the color of state or territorial law, *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The plaintiffs have also made further allegations pursuant to 42 U.S.C. § 1981[15] and 42 U.S.C. § 1985(3).[16]

Plaintiffs allege several theories of recovery: (1) violations of Fourth and Fourteenth Amendment for unreasonable search and seizure, and excessive force, regarding both the April 24, 1999 incident and the December 20, 1999 incident; (2) allegations that Karpiscak and Schwarz engaged in a conspiracy to falsely arrest Kyung–Ho; (3) violations of the Fifth and Fourteenth Amendment right to equal protection because the actions against Kyung–Ho, an American of Korean descent were motivated by racial animus; (4) allegations that the SBPD and Chief Paquette failed to instruct, train and adequately supervise its officers; (5) allegations that the SBPD adopted an un-

constitutional policy and practice of racial animosity and intentional discrimination.

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prods. Co.,* 789 F.2d 230, 232 (3d Cir.1986). When the non-moving party bears the burden of proof at trial, the moving party can satisfy its burden of production by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden of showing there is an absence of a genuine issue of fact, the burden shifts to the non-moving party to "make a sufficient showing on an essential element of [its] case" to establish a factual dispute. *See id.* at 323, 106 S.Ct. 2548. The nonmovant may not rest on mere allegations, but rather must provide specific facts evincing the material dispute. *See*

tion, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**15.** Section 1981 states: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal

benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

**16.** Section 1985(3) states: "If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws . . . whereby another is injured . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

*id.* at 322 n. 3, 106 S.Ct. 2548; Fed. R.Civ.P. 56(e).

When the non-moving party's evidence in opposition to a properly supported motion for summary judgment is merely "colorable" or "not significantly probative," the court may grant summary judgment. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment may be granted only if no reasonable trier of fact could find for the non-moving party. *See id.*

Conversely, if a reasonable trier of fact could find for the non-moving party, the court must deny summary judgment. *See id.* Moreover, in making this determination, a court must draw all reasonable inferences in favor of the non-movant, *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), while keeping in mind that the non-movant may not "rest upon mere allegations, general denials, or ... vague statements." *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir.1991); Fed.R.Civ.P. 56(e). The summary judgment procedure enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

## II. *Conspiracy*

Plaintiffs allege that Karpiscak and Schwarz engaged in a conspiracy against Kyung–Ho. (Complaint, Count III, ¶ 6). Defendants deny that a conspiracy took place. The Court is somewhat befuddled by plaintiffs' allegations because plaintiffs have not briefed the issue of conspiracy and rely solely on the assertions in the complaint. (Defendants' Brief Supporting its Motion for Summary Judgment "Def. Brief" at 18).

Summary judgment is granted when a moving party "point[s] out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548. The Court recognizes that defendants have denied the conspiracy allegations against Karpiscak and Schwarz. The Court further acknowledges that plaintiffs have not presented the Court with evidence supporting the conspiracy allegations. Faced with a record devoid of substance to sustain plaintiffs' conspiracy claim, the Court grants summary judgment in favor Karpiscak and Schwarz.

## III. *False Arrest*

■ Plaintiffs allege that Karpiscak and Schwarz falsely charged and arrested Kyung–Ho with disorderly conduct and simple assault. (Complaint, Count III, ¶ 6). In response, defendants contend that the Officers had probable cause to arrest Kyung–Ho.

"The proper inquiry in a section 1983 claim based on false arrest ... is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Groman v. Township of Manalapan,* 47 F.3d 628, 634 (3d Cir.1995) (*quoting Dowling v. City of Philadelphia,* 855 F.2d 136, 141 (3d Cir.1988)). Probable cause exists when, at the time of the arrest, the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a reasonable person's belief that a suspect was committing an offense. *U.S. v. Glasser,* 750 F.2d 1197,

1205 (3d Cir.1984) (citations omitted); *Orsatti v. New Jersey State Police,* 71 F.3d 480, 483 (3d Cir.1995). Probable cause is a factual analysis from which the officers on the scene must make an immediate determination. *Glasser,* 750 F.2d at 1206. It is the function of the courts to determine whether the objective facts available to the officers, at the time of the arrest, were sufficient to justify a reasonable belief that an offense was being committed. *Id.* Although the existence of probable cause is a factual issue, courts have granted summary judgment based on a probable cause determination in appropriate cases. *See Deary v. Three Un-Named Police Officers,* 746 F.2d 185, 191 (3d Cir.1984).

The Court must determine, based on evidence viewed in plaintiffs' favor, whether probable cause existed to charge Kyung–Ho with disorderly conduct.[17] Karpiscak and Schwarz simply walked onto the La's property and approached Kyung–Ho during daylight hours to investigate the neighbors' allegations of irregular behavior. Kyung–Ho's initial reaction of hostility,[18] at the mere sight of the uniformed officers reasonably merits Karpiscak and Schwarz's interest in continuing their probe. The Court disagrees with plaintiff and does not find that Karpiscak and Schwarz should have turned around and gave up their investigation when Kyung–Ho shouted at them to leave.

In evaluating the Officers' behavior, the Court is mindful that Karpiscak and Schwarz were called to Kyung–Ho's neighborhood pursuant to a complaint of a person having a "mental breakdown." This characterization was coupled with the descriptions of Kyung–Ho's bizarre behavior as alleged by the neighbors. Regardless of the ultimate truth of the neighbors' representations of Kyung–Ho, the Court must consider the effect of those words when evaluating the reasonableness of Karpiscak and Schwarz's actions.

Kyung–Ho deliberately and defiantly refused to heed the commands of uniformed police officers. Furthermore, Kyung–Ho was recklessly provocative when he took off his shirt and announced that he did not need a weapon, as if challenging the officers to a hand-to-hand brawl. A reasonable officer could have found that Kyung–Ho's demeanor and gestures were hostile and potentially dangerous regardless of any additional negative characterizations. Kyung–Ho's actions viewed through the eyes of Karpiscak and Schwarz comport with the elements of a disorderly conduct. Therefore, the Court finds that Karpiscak and Schwarz had probable cause.

Plaintiffs also claim that Karpiscak and Schwarz wrongly charged Kyung–Ho with simple assault.[19] Plaintiffs contend that because Kyung–Ho was only responding to the officers' improper actions, and

---

**17.** The New Jersey statute provides:

 2C:33–2. Disorderly Conduct
 a. Improper behavior. A person is guilty of a petty offense, if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he (1) Engages in fighting or threatening, or in violent or tumultuous behavior; ...
 "Public" means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood.

**18.** Myung–Ok stated Kyung–Ho's tone of voice was loud as he told the police officers to get a search warrant if they want to speak with him. (Myung–Ok Dep. at 50).

**19.** The New Jersey statute provides:
 2C:12–1. Assault
 a. Simple assault. A person is guilty of simple assault if he: (1) Attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; ....

he was entitled to fight back and resist arrest. (Plaintiffs' Memorandum of Law "Pl. Brief" at 21).

In New Jersey, however, "when an officer makes an arrest, legal or illegal, it is the duty of the citizen to submit and, in the event the seizure is illegal, to seek recourse from the courts for the invasion of his right of freedom." *State v. Mulvihill,* 57 N.J. 151, 155–56, 270 A.2d 277 (1970). Courts in the federal system, moreover, have also recognized that there is no federal constitutional right to resist an unlawful arrest. *See Kilheffer v. Plowfield,* 409 F.Supp. 677, 680 (E.D.Pa.1976) (*citing Horelick v. Criminal Court,* 366 F.Supp. 1140 (S.D.N.Y.1973)).

Kyung–Ho acted, at the very least, inappropriately when he vigorously fought against being restrained. By struggling with Karpiscak and Schwarz, Kyung–Ho risked bodily injury not only to himself but also to the Officers. Kyung–Ho did not have the right to resist Karpiscak and Schwarz whether or not he perceived the arrest to be wrongful. The Court finds that Karpiscak and Schwarz had probable cause to arrest Kyung–Ho for both disorderly conduct and simple assault. Therefore, the Court grants summary judgment in favor of Karpiscak and Schwarz for the claim of false arrest. Additionally, the Court will deny plaintiffs' cross-motion for summary judgment for the identical claim.

## IV. *Unlawful Search and Seizure*

■ The Fourth Amendment protects a person's right to be secure in their persons and houses against unreasonable searches and seizures.[20] "Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." *Dorman v. United States,* 435 F.2d 385, 389 (D.C.Cir.1970). The constitutional safeguards that assure citizens the privacy and security of their homes is applicable in a case of entry to search for property and in a case for entry in order to arrest a suspect. *Id.* at 390. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586–87, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). However, seizure of property in plain view is presumptively reasonable and involves no invasion of privacy, assuming there is probable cause. *Id.*

### A. April 24, 1999 Incident

■ Plaintiffs claim that Karpiscak and Schwarz deprived Kyung–Ho of his right to be free from unreasonable searches by walking onto the La's property "without an invitation, without a warrant, [and] without probable cause." (Complaint, Count I, ¶ 5). Defendants reply that Karpiscak and Schwarz had a duty to investigate by speaking with Kyung–Ho, pursuant to the dispatch call and the complaints of the neighbors. Additionally, defendants contend that no privacy rights were violated because during the discussion, Kyung–Ho was outside of his home in plain view.

In pursuit of their inquiry, Karpiscak and Schwarz ventured no further than the front yard of the La's property. They did not need to enter the home because Kyung–Ho was chopping wood outside. Such an approach is not the type of intrusive police action against which the Fourth Amendment so zealously guards.

**20.** The Fourth Amendment provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.
U.S. Const. Amend. IV

In addition, Karpiscak and Schwarz went to the La's neighborhood pursuant to a dispatch call regarding a person suffering a possible mental breakdown. Moreover, after talking with the neighbors, Karpiscak and Schwarz received additional information denoting that Kyung–Ho's behavior was erratic and potentially dangerous. Thus, upon leaving the Sisco home, Karpiscak and Schwarz possessed an adequate basis to justify questioning Kyung–Ho outside his home about the numerous accusations. The Court finds no violation of Fourth Amendment rights because Karpiscak and Schwarz's contact with Kyung–Ho under this set of circumstances can not be viewed as an intrusion, or an invasion of privacy. Therefore the Court grants defendants' motion for summary judgment.

### B. December 20, 1999 Incident

■ Plaintiffs claim that Hayduka and Williams violated their Fourth Amendment rights by entering the La residence without a warrant on December 20, 1999. (Complaint, Count III, ¶ 14). Upon careful reading of the record, the Court finds that plaintiffs' allegations are without merit.

When he spoke with Hayduka by telephone, Vak consented to the psychological examination of his son. Vak expected the officers and healthcare workers to arrive and he answered the front door for the group about twenty minutes after the phone call. Vak then exited the front door and led the group into the garage. The Court acknowledges that Vak did not verbally invite the officers and healthcare workers into the garage, nevertheless, he did not stop the group from following. Furthermore once in the garage, Vak knocked on the door that opened into Kyung–Ho's room, and called his son to come to the garage to speak with the group of people.

The record reflects that Vak, tacitly by his conduct, agreed to the officers' request to question his son. He led the group into the garage then he called his son to join them in the garage. This Court, applying a rule of reasonableness, is unwilling to find that Vak viewed the actions of the police officers as an intrusion even if the express words of an invitation were not spoken. Far from acting as if his privacy was being invaded, Vak fully cooperated with Hayduka, Williams and the healthcare workers. Clearly, Hayduka, Williams and the healthcare workers were implicitly invited to enter the La's garage. Therefore, this Court does not find that Hayduka and Williams violated plaintiffs' Fourth Amendment rights by entering the La's garage.

■ In addition, defendants assert that because of the exigency of the circumstances, Hayduka and Williams were not required to obtain a warrant before entering the main part of the La's house. Defendants contend that once Kyung–Ho clutched the wood splitter and backed into the house, exigent circumstances arose which permitted Hayduka and Williams to enter the house. Plaintiffs attempt to survive summary judgment by stating that a jury should decide if entry by Hayduka and Williams was reasonable because the Officers were not aware that anyone was in the house to protect. (Pl. Brief at 18).

Although, warrantless searches are presumptively unreasonable under the Fourth Amendment, exigent circumstances can excuse the warrant requirement. *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir.1996) (*citing Welsh v. Wisconsin*, 466 U.S. 740, 749, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984)). To qualify as exigent, the officers must reasonably believe that someone is in **imminent** danger. *Parkhurst*, 77 F.3d st 711 (emphasis in original).

Hayduka and Williams entered the house after Kyung–Ho, an unstable individual with a history of violence, picked up a potentially lethal weapon and directed it toward the police. From that moment on, imminent danger was ever present and Hayduka and Williams had a duty to protect those inside the house.

The presence or absence of other persons in the house misses the point and obfuscates the issue. Police officers have a duty to protect all citizens, which includes the potentially unstable person from himself. Therefore, regardless of whether Myung–Ok, or anyone else was in the house, Hayduka and Williams had a duty to enter.

This Court finds that Hayduka and Williams prudently entered the La's home. Furthermore, plaintiffs' Fourth Amendment rights were not violated even though the Officers did not have a warrant, because exigent circumstances existed. The Court will, therefore, grant defendants' motion for summary judgment.

## V. *Excessive Force*

Police officers are privileged to commit battery pursuant to a lawful arrest, the privilege however, does not extend to the use of excessive force. *Edwards v. City of Philadelphia*, 860 F.2d 568, 572 (3d Cir. 1988). The use of excessive or unreasonable force by police officers in the exercise of their authority gives rise to a § 1983 cause of action. *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The Supreme Court has held that excessive force claims are to be analyzed under the Fourth Amendment reasonableness standard rather than the Fourteenth Amendment Substantive Due Process standard. *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). A Fourth Amendment reasonableness inquiry is objective, so the question before the Court is whether the offi-

cers' actions in effectuating the arrest were objectively reasonable, without regard for any underlying intent or motivation. *United States v. Johnstone*, 107 F.3d 200, 204 (3d Cir.1997).

To determine whether the force used was reasonable, a court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. The reasonableness inquiry is objective, but should allow for the particular circumstance of police action which are often "tense, uncertain, and rapidly evolving." *Id.* at 397, 109 S.Ct. 1865.

The defendants are entitled to summary judgment if, as a matter of law, "the evidence would not support a reasonable jury finding that the police officers' actions were objectively unreasonable." *Groman*, 47 F.3d at 634.

### A. April 24, 1999 Incident

The reasonableness of particular force must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Minutes before approaching the La's residence, a number of concerned people provided Karpiscak and Schwarz with an earful of disparaging commentary regarding the unusual behavior of Kyung–Ho. The testimony of both parties confirms that although Karpiscak and Schwarz merely walked toward the La residence, Kyung–Ho shouted at the police officers and threatened them from further approaching. Although plaintiffs contends that Kyung–Ho did not "disobey[ ] an instruction or [make] a threatening move," plain-

tiffs concede that "Schwarz told Kyung–Ho not to take another step. Kyung–Ho took one more step forward ...." (Pl. Brief at 2, 19). Considering Kyung–Ho's erratic exploits without any apparent provocation, the Court found that Karpiscak and Schwarz could reasonably view Kyung–Ho as both threatening and dangerous. Therefore, it was reasonable for Karpiscak and Schwarz to have perceived that the application of force was required in order to take Kyung–Ho into custody.[21]

The Court moreover, finds that Karpiscak and Schwarz did not apply an amount of force that would qualify as excessive. Faced with the potential danger of Kyung–Ho's deliberate disobedience. Karpiscak dispersed the pepper spray only once toward Kyung–Ho's face. In reaction to being sprayed, Kyung–Ho did little more than raise his arms. Whether the spray did not reach Kyung–Ho because he was in the midst of taking off one of shirts or whether Kyung–Ho was inordinately immune to the effects of the spray is unclear. However, it is clear that Karpiscak and Schwarz did not expect Kyung–Ho's lack of response to the stinging pepper spray. Therefore, the potential for danger had not subsided, which justified Karpiscak's interspersol of a second blast to ensure that Kyung–Ho was subdued.

Furthermore, Karpiscak .and Schwarz did not strike or use their baton to repress Kyung–Ho. Schwarz only used wrestling moves and holding techniques in order to gain control of Kyung–Ho and place him in handcuffs. As a further indication of the weakness of plaintiffs excessive force claim, Kyung–Ho sustained only a scrape and bruises as a result of the altercation. Moreover, the Court notes that Kyung–Ho's injuries were more likely a result of his resisting arrest, rather than from his

being pepper sprayed. The Court does not find that Karpiscak and Schwarz used excessive force on April 24, 1999, and thus grants summary judgment to defendants. This Court furthermore, will deny plaintiffs' cross-motion based on the same claim.

## B. December 20, 1999 Incident

### 1. *Officer Hayduka*

■ The Supreme Court recognized that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Garner*, 471 U.S. at 7, 105 S.Ct. 1694. The *Garner* Court held that deadly force will only be considered reasonable when "it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* at 3, 105 S.Ct. 1694.

The Third Circuit has noted that "since the victim of deadly force is unable to testify, courts should be cautious on summary judgment to 'ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify.'" *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir.1999) (*quoting Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994)).

Defendants claim that Hayduka's use of deadly force was justified because Kyung–Ho refused to drop his weapon when commanded to, and he lunged at Hayduka with a deadly weapon before the trigger was pulled. To support their position, defendants cite *Rhodes v. McDannel*, 945 F.2d 117 (6th Cir.1991). The Circuit Court in *Rhodes*, upheld a district court order of

---

**21.** The Court notes that in the preceding section, after Kyung–Ho took the final step forward and removed his shirt, Karpiscak and Schwarz had probable cause to arrest Kyung–Ho for disorderly conduct.

summary judgment for a defendant police officer who fatally shot a man wielding a machete. In *Rhodes,* police were dispatched to respond to a man threatening violence with a deadly weapon. *Id.* at 118 When the officers arrived, the man advanced at the officers with his machete raised and refused to heed the commands of the police to drop the weapon. *Id.* When the man was within four to six feet of the officers, one of the officers fired his gun. *Id.*

When viewed in a light most favorable to plaintiffs, the evidence provided to this Court does not present an open road to summary judgment as did the uncontested facts in *Rhodes.* The parties agree that Kyung–Ho grabbed the wood splitter and backed into the house with Hayduka and Williams following him. The events beyond that point until the shooting, however, were witnessed only by Hayducka, Williams, and the deceased. Therefore, although the accounts of the shooting from both Hayduka and Williams are identical, the Court proceeds with caution because Kyung–Ho is unable to testify.

Hayduka and Williams have both testified that Kyung–Ho lunged at Hayduka which precipitated the shooting. Plaintiffs' medical expert, Dr. Hoffman, directly disputes the testimony of the two Officers. The Hoffman Opinion contends that based on the wound tract, Kyung–Ho could not have been lunging when he was shot. (Hoffman Opinion at 3). Whether Dr. Hoffman possesses the expertise to render this conclusion and create a genuine issue of material facts, contrary to eyewitness testimony is unknown. His qualifications and the reasons for his opinion require a more piercing and in depth inquiry before the issue is submitted to a jury. This Court will therefore, reserve its Opinion regarding Hayduka's use of force until after a Daubert hearing is held on the qualifications of Dr. Hoffman.

### 2. *Officer Williams*

Plaintiffs contend that Officer Williams is also liable for the use of excessive force against Kyung–Ho because he should have attempted to stop Hayduka from using excessive force. If a police officer "fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under § 1983." *Skevofilax v. Quigley,* 586 F.Supp. 532, 543 (D.N.J.1984). The case law cited by plaintiffs offers examples of officers who passively watched while fellow officers gave prolonged beatings to individuals who posed no apparent threat. *See Skevofilax,* 586 F.Supp. at 532 (uniformed police officers refusing to intervene in an unprovoked beating of a man by off-duty police officers); *Davis v. Rennie,* 264 F.3d 86 (1st Cir.2001) (patient punched repeatedly in the head by mental health workers); *Mick v. Brewer,* 76 F.3d 1127 (10th Cir. 1996) (secret service agent failed to intervene when officer beat and dragged a woman who inadvertently parked her car too close to the road where the Russian president's motorcade was passing); *Byrd v. Brishke,* 466 F.2d 6 (7th Cir.1972) (a group of unidentified officers repeatedly beat a suspect and refused to provide medical relief for over an hour).

In contrast, the claim against Williams is based on one gun shot fired during a tense confrontation. Plaintiffs do not explain how Williams could have interfered with Hayduka's split-second decision. Plaintiffs contend that Williams should have stopped Hayduka from moving too close to Kyung–Ho because according to the edged-weapons training provided to the SBPD officers, a distance of twenty-one feet should be maintained between an officer and a suspect armed with an edged weapon. The Court accepts such a recommendation, but considers that (1) Hayduka and

Williams were only a few feet away from the wall, (2) they had to negotiate obstacles such as furniture and other objects and (3) the situation was tense and dangerous. Certainly, the Court acknowledges that Hayduka and Williams should have been aware that a distance of twenty-one feet is ideal. Neither Hayduka nor Williams, however, had the opportunity to allow the optimum amount of space because they had additional factors to negotiate such as Kyung–Ho, a mentally unstable individual who was prone to violence and was wielding a potentially deadly weapon in an unfamiliar and cluttered room. Considering the close proximity of the parties and the rapidity of the events, it is unrealistic to assume that Williams was able to intervene in the single shot that unfortunately killed Kyung–Ho. The Court concludes that it would be unreasonable and lacking in candor to charge Williams with the duty to intervene and grants defendants' motion for summary judgment.

## VI. *Qualified Immunity*

■■■ Government officials are entitled to qualified immunity from civil suits for damages arising out of the performance of their official duties, as long as their actions could reasonably be considered consistent with the rights they are alleged to have violated. *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The key inquiry in analyzing a claim of qualified immunity is whether defendants' alleged conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* at 638–40, 107 S.Ct. 3034.

The right to be free from the use of excessive force under the Fourth Amendment is clearly established. *Graham*, 490 U.S. at 392–93, 109 S.Ct. 1865. The issue is thus whether plaintiffs have alleged facts supported by sufficient evidence to demonstrate that the shooting of Kyung–Ho by Hayduka was unreasonable in light of his clearly established constitutional rights.

According to the testimony of the officers present, Hayduka fired a single shot at Kyung–Ho who was lunging at him with a lethal weapon in his hand. The Hoffman Opinion, however, concludes that Kyung–Ho could not have been lunging, in fact, he was in a kneeling or squatting position, facing away from Hayduka. If the Hoffman Opinion's version of the events are credible and Kyung–Ho was not lunging, but was crouching away from Hayduka then, the shooting may have been unreasonable in light of Kyung–Ho's right to be free from the use of excessive force. Thus, Hayduka would not be entitled to qualified immunity. Therefore, until the Court obtains assurances on the qualifications of Dr. Hoffman in a Daubert Hearing, the Court will reserve its Opinion on whether Hayduka is entitled to qualified immunity.

## VII. *Municipal Liability*

Plaintiffs do not allege any facts or theories that implicate the SBPD's police chief, Paquette, on an individual basis. Therefore, the Court will view potential liability of Paquette in his official capacity only. A plaintiff "seeking to recover on a damages judgment in an official capacity suit must look to the government entity itself." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The official capacity claims against Paquette are duplicative of those against the municipality and will be considered jointly below and referred to solely as the SBPD.

Plaintiffs claim that the SBPD failed to instruct its officers in the proper use of

force and is therefore liable for the alleged violations against Kyung–Ho. (Complaint, Count VII, 3). Specifically, plaintiffs contend that the SBPD failed to adequately train its officers in the use of force generally, and in the use of force against emotionally disturbed persons (EDPs).[22] The Supreme Court decided in *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) that municipalities are "persons" within the meaning of § 1983 and thus can be liable for constitutional violations. The Supreme Court acknowledged that a municipality may not, however, be held liable solely because it employs a person who violated another's constitutional rights. *Board of the County Commr's of Bryan County v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). In other words, rather than allowing municipal liability on the basis of *respondeat superior*, the Supreme Court requires a plaintiff to identify a municipal policy or custom that caused the plaintiff's injury. *Id.* (emphasis in original).

### A. Failure to Train in the Use of Force

Notwithstanding that the SBPD provides extensive use of force training to its officers, plaintiffs nevertheless allege that the training was inadequate and resulted in the death of Kyung–Ho. To support their allegations, plaintiffs' expert, Henry C. Branche, opined that the SBPD officers lacked adequate training in the use of deadly physical force, physical force, and

maintaining a proper zone of safety. (*See* Plaintiffs' expert report "Branche report" at 23–24).

When a municipality maintains a training program for its officers, but a plaintiff argues that the training is inadequate, the circumstances under which municipal liability can be found are limited. *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In *City of Canton*, the Supreme Court explained that it is not enough to establish that the injury could have been avoided by more or better training. *Id.* at 390–91, 109 S.Ct. 1197.

Defendants have demonstrated that the Officers received the required New Jersey Police Training Commission Performance Objectives in their respective "Basic Training" classes at the police academy prior to or shortly after their appointment as police officers.[23] Additionally, all of the defendant officers attended several supplemental training courses and seminars which included: domestic violence, evidence training, edged-weapons awareness, firearms safety, hostage negotiations, Alzheimer's training and cultural diversity. (*See* Defendants' expert report "Craparotta Report" at 4–5). Paquette testified further that edged-weapons training was provided in 1998 and that use of force training is offered biannually to all officers of the SBPD. (Paquette Dep. at 10–12). Furthermore, the Craparotta Report concluded that the SBPD's training program and the supervision that the officers received

---

**22.** The Court notes that because it is unable to discern whether or not Hayduka violated Kyung–Ho's constitutional rights until after a Daubert Hearing is held, it will consider the issue of municipal liability. A court may not find a municipality liable based on § 1983 when there is no constitutional violation. Thus, had the court ruled in Hayduka's favor for the excessive force claim, it would not proceed to analyze municipal liability.

**23.** The areas covered in the mandatory training includes: professional development, criminal justice systems, police community relations, law, legal requirements of arrest, search, seizure, evidence and use of force, communications, vehicle operations, emergency medical care, weaponry, and unarmed defense, patrol concepts, traffic, criminal investigations and physical fitness. (*See* Defendants' Expert Report "Craparotta Report" at 3).

met the standards set by the New Jersey Police Training Commission Performance Objectives, the New Jersey Police Practices and Procedures, the South Brunswick Township Police Department Training Objectives, the New Jersey Attorney General Guidelines and New Jersey Law. (Craparotta report at 46). Nevertheless, the Branche Report opined that the training received by the SBPD officers was lacking compared to the standards set by the New York Police Department. (Branche report at 17–24).

Plaintiffs do not contest the reports that the SBPD officers received the aforementioned training, nor do they challenge that the training complied with the standards set by the aforementioned New Jersey state and municipal authorities. Instead, plaintiffs allege that the training program was inadequate as compared to the standards set by another state. The Supreme Court has expressly rejected attempts to "engage the federal courts in an endless exercise of second-guessing municipal employee training programs." *City of Canton*, 489 U.S. at 392, 109 S.Ct. 1197. The duty of this Court is not to discuss whether the New Jersey guidelines properly address the training of the SBPD's police officers or whether the SBPD would be better off adopting the training programs used in New York. Plaintiffs, furthermore, failed to establish the ways in which the alleged deficiency in use of force training caused the violations against Kyung–Ho.

An allegation of failure to train against a municipality must overcome a high threshold of proof to survive summary judgment, particularly in a case such as this where the SBPD has an uncontested and extensive use of force training program. Because plaintiffs concede to the extensive training offered by the SBPD as outlined in the Craparotta Report and have not established a causal link between the supposed training failures and an alleged constitutional violation, the Court finds that plaintiffs are unable to sustain their claim of failure to train in the use of force. Therefore, the Court grants defendant's motion for summary judgment.

## B. Emotionally Disturbed Persons (EDPs)

■ Defendants' move for summary judgment, claiming that plaintiffs have failed in their burden of presenting that the municipality did not train its officers in the use of force against emotionally disturbed persons ("EDP"). In addition, defendants contend that plaintiffs have failed to demonstrate that the alleged lack of training caused a violation of Kyung–Ho's rights. Plaintiffs respond that although its officers dealt with EDPs regularly, the SBPD did not maintain a written policy pertaining to the use of force when dealing with EDPs therefore, the SBPD was "deliberately indifferent to the probability that its officers would come into contact with EDPs, and the need for training and guidelines." (Pl. Brief at 6).

Where a policy is constitutional on its face, more proof than a single incident is necessary to establish a municipality's fault. *Oklahoma City v. Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). "Municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

Identification of an alleged offending municipal custom alone, however, does not suffice for a cause of action. The Supreme Court in *City of Canton* reasoned that only when a municipality's failure to train is infected by a deliberate indifference to

constitutional rights can that municipality be liable for its failure to train. *City of Canton,* 489 U.S. at 388, 109 S.Ct. 1197 (citations omitted).

The Third Circuit has created a test to determine whether the action or inaction of a municipality amounts to deliberate indifference. A plaintiff must show that "(1) municipal policy makers know that the employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employee mishandling; (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Philadelphia,* 181 F.3d 339, 357 (3d Cir. 1999) (footnote omitted).

Plaintiffs can establish the first element of deliberate indifference because the SBPD was aware that its officers came into contact with EDPs because it maintained a practice of contacting and accompanying UMDNJ healthcare workers for on-site psychological screenings. Plaintiffs, however, are unable to establish the remaining two elements to demonstrate that the SBPD acted with deliberate indifference. The SBPD's decision to examine Kyung–Ho did not involve a difficult choice, in fact, the SBPD had been using the UMDNJ for on-site screening for several years.[24] Furthermore, Hayduka testified that he had accompanied screeners on approximately twelve previous screenings without conflict. (Hayduka Dep. at 27). Moreover, there is nothing in the record to indicate that incidents of employee mishandling of EDPs occurred in the past. Finally, the Court can not find that a "wrong choice" would necessarily lead to a deprivation of constitutional rights. Mental health screener Hodgson testified that he had worked with the SBPD in the past and that he had performed nearly 2000 on-site screenings in his career, none of which

resulted in a similar tragedy as befell Kyung–Ho. (Hodgson Dep. at 15, 24).

Prior to the unfortunate incident with Kyung–Ho, the SBPD's unwritten practice of accompanying UMDNJ health care workers to on-site screenings had a stellar performance history. The SBPD had no reason to investigate or alter the practice because it had worked well for many years. With only a single incident of misfortune in an otherwise flawless practice of on-site screenings, the Court cannot conclude that the SBPD acted with deliberate indifference in its handling of EDPs.

To support their position, plaintiffs rely on a Sixth Circuit opinion which reversed a summary judgment ruling for a municipality in a failure to train case. *Russo v. City of Cincinnati,* 953 F.2d 1036 (6th Cir. 1992). In *Russo,* a paranoid schizophrenic, who barricaded himself in his apartment was shot several times and killed when police attempted to return him to a psychiatric institute. The Sixth Circuit ruled that based on three key pieces of evidence offered by plaintiffs, the municipality's training program regarding the handling of "mentally disturbed persons is constitutionally inadequate." *Id.* First, several officers testified that they were often called to respond to situations involving mentally disturbed individuals, but none of the officers were able to specify any training received for handling such situation. *Id.* at 1046. Second, an Office of Municipal Investigation report stated, "recruit training regarding the mentally ill appears inadequate, in-service training is virtually non-existent." *Id.* Third, plaintiff's expert revealed that "none of the involved police personnel understood the appropriate procedures for reacting to mentally ill individuals ... a failing which must inevitably be linked to deficient training." *Id.* at 1047.

---

**24.** According to Paquette's testimony, the SBPD had worked with UMDNJ for three to four years prior to the incident with Kyung–Ho. (Paquette Dep. at 20).

In contrast to the blatantly damaging evidence uncovered in *Russo,* plaintiffs rely solely on the fact that the SBPD did not have a written policy regarding use of force against EDPs. To implicate a municipality, a plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged." *Bryan County,* 520 U.S. at 404, 117 S.Ct. 1382.

Although the officers acknowledged that they did not receive specific EDP training, Hayduka testified that he had received training regarding the practice of contacting the UMDNJ and accompanying mental health evaluators to on-site screenings. (Hayduka Dep. at 24–45). Furthermore, the officers each testified that they were trained in a variety of situations and in using several methods of dealing with people of varying psychological states. When asked if he received training regarding use of force against mentally disturbed individuals, Hayduka stated he received extensive on-the-job training, as well as training on handling people with Alzheimer's Disease. (Hayduka Dep. at 20). Officer Schwarz stated that in continuum of force training, topics included discussions of rational as well as irrational persons. (Schwarz Dep. at 50). Moreover, unlike in *Russo,* plaintiffs have not offered any internal documentation that would establish that the SBPD was aware of a lack of training in dealing with EDPs, or that there existed the potential for rampant injustice as a result of alleged lack of training.

In other words, plaintiffs were unable to demonstrate that the SBPD was the "moving force" behind the alleged injury to Kyung–Ho. Because far from sanctioning a policy prone to potential injustice, the SBPD continued with its proven successful, unwritten practice of working in conjunction with UMDNJ. The Court will therefore grant defendants' motion for a summary judgment and will deny plaintiffs' cross-motion for summary judgment.

### C. Policy of Intentional Discrimination and Racial Animus

 In count six of the Complaint, plaintiffs claim violations pursuant to § 1981, § 1983, § 1985(3), alleging that the SBPD "adopted an unconstitutional policy, custom, practice, and usage of racial animosity and intentional discrimination toward plaintiffs because they are Korean–American." To support their position, plaintiffs refer the Court, generally, to the depositions of Vak and Myung–Ok and state "[i]t is apparent that the SBPD, which did not hire its first Asian officer until after the shooting of Kyung–Ho La, did not make any effort to understand what was really going on and instead jumped to conclusions . . . ." (Pl. Brief at 25). However, beyond the assertions of intentional discrimination or conspiracy motivated by discriminatory animus described in their complaint and moving papers, plaintiffs have not provided substance to support their allegations.

To establish a violation of § 1985(3), the plaintiff must allege and prove; (1) a conspiracy motivated by invidious discriminatory animus, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy; and (4) that a person is, as a result, injured in his person or deprived of any right or privilege of a citizen of the United States. *See Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993); *Burt v. Ferrese,* 871 F.2d 14, 17 (3d Cir.1989); *Pitak v. Bell Atl. Network Servs., Inc.,* 928 F.Supp. 1354, 1368–69 (D.N.J.1996). A § 1985(3) conspiracy claim must be plead-

ed with factual specificity. *See Church of Human Potential, Inc. v. Vorsky,* 636 F.Supp. 93 (D.N.J.1986).

The fact that the SBPD did not have an Asian officer on the force at the time of the shooting does not implicate the SBPD with invidious discriminatory animus. In addition, plaintiffs have failed to demonstrate that an agreement existed.

With nothing but the knowledge that the SBPD did not have an Asian officer on the force, the Court will not find that plaintiffs are able to sustain a § 1981 claim or a § 1985(3) claim. Looking at the record in plaintiff's favor, the Court considered that Mrs. Sisco's allegations of Kyung–Ho's unusual dancing may have been Tai Chi, and a strange headdress worn by Kyung–Ho can be traced to an illustration of traditional Korean costume.[25] These explanations, however, are not enough to sustain plaintiffs allegations as they pertain to the SBPD.

On each of the three occasions, the SBPD went to the La's home pursuant to neighbors' complaints. The officers of the SBPD did not venture to the La's house on their own accord. Furthermore, possible misunderstanding and cultural insensitivities of the La's neighbors does not necessarily reflect on the attitudes and awareness of the SBPD. The Court has found that the SBPD acted prudently in its dealings with Kyung–Ho and his family. And, although the events of the association ended in terrible tragedy, the Court has not found that the municipality had violated any of the La's rights. Faced with the record before it, the Court is unable to make even a tenuous connection to the contact between Kyung–Ho and the SBPD with either discriminatory animus or conspiracy. This Court will accordingly grant summary judgment to defendants.

25. *See* page 5 n. 3, of this Opinion for the Court's discussion of the testimony of Myung–

## CONCLUSION

Therefore, in accordance with the Opinion above, the Court grants summary judgment to Hayduka, Williams, Karpiscak and Schwarz for the claims of unreasonable search and seizure. The Court grants summary judgment to Karpiscak, Schwarz and Williams for the claim of excessive force. In addition, the Court grants summary judgment to Karpiscak and Schwarz for the claims of conspiracy and false arrest. The Court, furthermore, grants summary judgment to the SBPD and Paquette for the claims of failure to train and racial animus.

The cross-motion for summary judgment filed by plaintiffs is denied on all claims. Finally, the Court reserves its ruling on whether Hayduka is entitled to summary judgment on the use of excessive force, pending a Daubert hearing.

An appropriate order is attached.

## *ORDER*

In accordance with the Court's Opinion filed herewith,

It is on this 24th day of June, 2003,

ORDERED that Defendants Hayduka, Williams, Karpiscak and Schwartz's motion for summary judgment based on the claim of unreasonable search and seizure is granted, and it is further

ORDERED that Defendants Karpiscak, Schwartz and Williams' motion for summary judgment based on the claim of excessive force is granted, and it is further

ORDERED that Defendants Karpiscak and Schwartz's motion for summary judgment based on the claims of conspiracy and false arrest is granted, and it is further

Ok in response to the alleged erratic behavior of Kyung–Ho.

ORDERED that Defendants SBPD and Paquette's motion for summary judgment based on the claims of failure to train and racial animus is granted, and it is further

ORDERED that Plaintiffs' motion for summary judgment is denied on all claims, and it is further

ORDERED that both Plaintiffs and Defendants contact courtroom deputy Gail Hanson at 973–645–6340 to arrange a Daubert hearing regarding plaintiffs' medical expert Dr. Walter I. Hoffman, M.D., F.C.A.P., and it is further

ORDERED that the Court reserves its ruling on whether to grant or deny Defendant Hayduka's summary judgment motion based on excessive force and qualified immunity until after the Daubert hearing.